UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REALTIME TRACKER, INC.,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>RELX, INC., *doing business as LexisNexis,*<br><br>                              Defendant. | 21 Civ. 8815 (PAE)<br><br><u>OPINION & ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

This case involves a patent for billable timekeeping.  Plaintiff Realtime Tracker, Inc.

("Realtime") holds rights in U.S. Patent No. 8,229,810 (the "'810 Patent" or the "Patent") for the

"Realtime Billable Timekeeper Method, System And Apparatus," which it describes as a "novel

computer system, operation and function" for tracking billable hours for professionals in client

service fields.  Dkt. 17 ("Amended Complaint" or "AC") ¶¶ 11–12.  Realtime's invention, as

claimed, comprises a "specific, structured front end user interface, *i.e.*, a realtime billable

timekeeper entry box" and "back end computer processing to automatically detect, time and

record billable time for an individual on a task by task basis." *Id.* ¶ 12.  Realtime alleges that

there has been "widespread infringement" of the Patent, including by defendant RELX, Inc.

("RELX"), doing business as LexisNexis, whom Realtime sues for patent infringement, based on

the "Juris Suite Timer" software ("Juris Suite") that RELX manufactures and markets to legal

professionals through its LexisNexis Division. *Id.* ¶¶ 24, 27.  Realtime's claims are of (1) direct

infringement, in violation of 35 U.S.C. § 271(a), (2) inducing infringement, in violation of 35

U.S.C. § 271(b), and (3) contributory infringement, in violation of 35 U.S.C. § 271(c). *Id.*

¶¶ 37–74. It seeks, *inter alia*, treble damages and attorneys' fees and expenses, asserting that the case is exceptional under 35 U.S.C. § 285. *Id.* at 27–28.

Now before the Court is RELX's motion to dismiss Realtime's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Dkts. 18, 19 ("Mot."). RELX argues that the '810 Patent's claims are directed to an abstract idea and therefore ineligible for patent protection, and that, in any event, Realtime has failed to plausibly allege patent infringement. Mot. at 1–2. For the following reasons, the Court grants the motion to dismiss.

## I.      Background

### A.      Factual Background[1]

#### 1.      The Parties

Realtime is a limited liability corporation, organized under New York law and owned by attorneys Cynthia S. Butera and Celeste M. Butera ("the Buteras"). AC ¶¶ 2, 9. It is the sole assignee and owner of the '810 Patent, "holding all rights, title and interest in and to the '810 Patent, including the sole right to enforce the '810 Patent." *Id.* ¶ 9.

RELX is a corporation, organized under Massachusetts law, with its headquarters and principal place of business in New York City. *Id.* ¶ 3. RELX, directly or through its LexisNexis division, makes, uses, offers for sale, licenses, sells, imports, and advertises the Juris Suite

---

[1] The facts are drawn from Realtime's Amended Complaint ("AC"), Dkt. 17. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers the documents attached to the AC, as well as a video cited in the AC. "[D]istrict courts may 'permissibly consider documents other than the complaint' for the truth of their contents if they 'are attached to the complaint or incorporated in it by reference,'" and "[a] document that is integral to the complaint and partially quoted therein may be incorporated by reference in full." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

software, which, *inter alia*, tracks professionals' billable time on a real-time basis. *Id.* ¶¶ 3, 6, 27.

### 2.  The '810 Patent

U.S. Patent 8,229,810, entitled "Realtime Billable Timekeeper Method, System and Apparatus," was issued by the U.S. Patent and Trademark Office to the Buteras on July 24, 2012. *Id.* ¶ 11; Dkt. 17-1 ("Patent") at 1.

The Patent includes method, apparatus, and computer readable claims that "implement a unique computer generated individual timekeeper entry box configured for inputting a personal code and a client identifier . . . with an automatic timer." AC ¶ 17. The Patent claims timekeeping of tasks on a document-by-document, telephone call-by-telephone call, and client service-by-client service basis, stating:

> The present invention relates to a timekeeping and tracking computer method, system and apparatus on a document-by-document, task-by-task, realtime basis for the purpose of generating associated billing information for an individual services-related professional. The invention also permits the individual to control the time allocated and the description for each document, whether Internet-based or local area network (LAN) based, or task, on a realtime basis through a timekeeper entry box generated for each such document and task.

Patent at 13. The claimed invention enables (1) "detecting opening of a document, initiation of a client-service or initiation of a telephone call," (2) "generating an individual timekeeper entry box configured with an entry for a personal code and a second entry for a client identifier," and (3) "contemporaneously tracking time associated with the personal code and the client identifier of the document in use, the client-service or the telephone call on task-by-task and client-by-client bases." AC ¶ 17 (internal quotation marks omitted); *see id.* ¶¶ 11–12. Realtime states that the Patent "teaches that the requirements of 'detecting' and 'generating' performed by the computer can involve user interaction," *id.* ¶ 18; *see also id.* ¶¶ 19–20, although the Patent also

includes language indicating automatic, rather than user-driven, detection of the initiation of tasks, *see, e.g.*, Patent at 13, 17.

The claimed invention's timekeeping of activities "can be performed in seriatim or by multi-tasking activities simultaneously," and can be recorded with respect to "multiple clients, by a single individual or by numerous employees in a professional environment or business on a daily basis." *Id.* ¶ 21; *see also id.* ¶¶ 22 (stating that such contemporaneous timekeeping "would not be possible to achieve for one or more individuals in the absence of the claimed invention"), 23 (same). According to the Patent's "Background" section, "while there have been numerous attempts to improve existing time and billing systems, none have addressed the need for a timekeeping tracking computer system, method and apparatus on a document-by-document, task-by-task, realtime basis for the purpose of generating a daily billing report for an individual service-related professional." Patent at 13; *see also* AC ¶ 16 (describing Patent as addressing "endemic problem in all professional service related companies and businesses").

Under the Patent, the "manner by which the computer method, system and apparatus may generate, track and record time may be through the use of a software program that generates a timekeeper entry box each time a document or task is being performed by the professional," and such timekeeper entry box "may automatically appear on the professional's computer screen every time the professional is working on a computer based task." Patent at 13. The timekeeper entry box includes a "time computation feature" that "will automatically start upon creation of a [local area network ("LAN")] document by the professional or upon commencement of a Internet-based task such as E-mail or a research session" and "will automatically cease upon closing of the LAN document, upon sending, saving or closing the e-mail, and upon cessation of the research session or other task by closing out of the session." *Id.* The box may include

command buttons for the professional to pause, erase, or end the timekeeping. *Id.* at 14.

Furthermore, the invention "generates a daily time and billing report" for the user that "can be

entered directly into the firm's or company's existing accounting or billing system used for

generating billing invoices for professional services rendered to clients." *Id.* The Patent includes

10 illustrations or charts, including block diagrams, exemplary illustrations, and flow charts

depicting the embodiments of the invention. *Id.* at 2–12, 14. In one embodiment, "the invention

detects the task being performed by the professional," including drafting or editing documents,

conducting research, and making or receiving a phone call. *Id.* at 16.

The '810 Patent includes 40 claims. Of those, Realtime alleges infringement by RELX of

six independent claims, including three method claims and three computer readable medium

claims, and 20 corresponding dependent claims. *See* AC ¶ 31. These are: independent method

claim 1 and dependent claims 2, 3, 4, 5, 6, 7, 8, and 32; independent method claim 26 and

dependent claims 33 and 35; independent method claim 29 and dependent claims 34 and 38;

independent computer readable medium claim 18 and dependent claims 19, 20, 21, 22, 23, and

24; independent computer readable medium claim 28 and dependent claim 37; and independent

computer readable medium claim 31 and dependent claim 40. *See id.*

Independent method claim 1 pertains to tracking time on a document-by-document basis

and claims:

> A method for individual realtime billable timekeeping using a computer,
> comprising a computer program for: detecting opening of at least one document;
> and generating an individual timekeeper entry box including an entry for a personal
> code and a second entry for a client identifier corresponding to said at least one
> document wherein said individual timekeeper entry box contemporaneously tracks
> time associated with said personal code and said client identifier said document is
> in use to track time for an individual by client on a document by document basis
> using the computer.

Patent at 17. The following allegedly infringed dependent claims are methods of claim 1:

[Claim 2:] The method of claim 1, wherein said individual timekeeper entry box includes said personal code.

[Claim 3:] The method of claim 1, further comprising receiving at least one of a document type, an author identifier, a recipient identifier and a subject description for entry within said individual timekeeper entry box.

[Claim 4:] The method [of] claim 1, wherein said individual timekeeper entry box includes at least one of the following functions: pause, end, erase, minimize, maximize and favorites.

[Claim 5:] The method, of claim 1, further comprising storing information obtained from said individual timekeeper entry box.

[Claim 6:] The method of claim 1, further comprising integrating information obtained from said individual timekeeper entry box into an accounting and billing system.

[Claim 7:] The method of claim 1, further comprising displaying at least one of a start time, an end time, a date, a total time, a client identifier, a personal code, a document type, an author identifier, a recipient identifier, and a subject description within said individual timekeeper entry box.

[Claim 8:] The method of claim 1, further comprising displaying a running clock within said individual timekeeper entry box. . . .

[Claim 32:] The method of claim 1, further comprising simultaneously tracking time for said individual on said at least one document and at least one of a client-service and a telephone call.

*Id.* at 17–18.

Independent method claim 26 pertains to tracking time on a client service-by-client service basis and claims, with language similar to claim 1:

A method for individual realtime billable timekeeping using a computer, comprising a computer program for: detecting initiation of at least one client service; and generating an individual timekeeper entry box including an entry for a personal code and a second entry for a client identifier corresponding to said at least one client-service wherein said individual timekeeper entry box contemporaneously tracks time associated with said personal code and said client identifier of said client-service to track time for an individual by client on a client-service by client-service basis using the computer.

*Id.* at 18. The following allegedly infringed dependent claims are methods of claim 26:

> [Claim 33:] The method of claim 26, further comprising simultaneously tracking time for said individual on said at least one client-service and at least one of a document and a telephone call. . . .
>
> [Claim 35:] The method of claim 26, wherein said individual timekeeper entry box includes said personal code and upon receipt of said client identifier contemporaneously tracks time associated with said personal code and said client identifier of said client-service.

*Id.* at 18–19.

Independent method claim 29 pertains to tracking time on a telephone call-by-telephone call basis and claims, with language similar to claims 1 and 26:

> A method for individual realtime billable timekeeping using a computer, comprising a computer program for: detecting initiation of at least one telephone call; and generating an individual timekeeper entry box including an entry for a personal code and a second entry for a client identifier corresponding to said at least one telephone call wherein said individual timekeeper entry box contemporaneously tracks time associated with said personal code and said client identifier of said telephone call to track time for an individual by client on a telephone call by telephone call basis using the computer.

*Id.* at 18.  The following allegedly infringed dependent claims are methods of claim 29:

> [Claim 34:] The method of claim 29, further comprising simultaneously tracking time for said individual on said at least one telephone call and at least one of a document and a client-service. . . .
>
> [Claim 38:] The method of claim 29, wherein said timekeeper entry box includes said personal code.

*Id.* at 18–19.

The three independent computer readable medium claims, along with the accompanying dependent claims, closely track their method claim counterparts.[2]

---

[2] Independent computer readable medium claim 18 pertains to tracking time on a document-by-document basis and claims:

> A computer readable medium having computer executable software code stored thereon for an individual realtime billable timekeeper, comprising: code for

detecting opening of at least one document; code for generating an individual timekeeper entry box including an entry for a personal code and a second entry for a client identifier corresponding to said at least one document wherein said individual timekeeper entry box contemporaneously tracks time associated with said personal code and said client identifier said document is in use to track time for an individual by client on a document by document basis.

Patent at 18. The following allegedly infringed dependent claims are computer readable mediums of claim 18:

[Claim 19:] The computer readable medium of claim 18, wherein said individual timekeeper entry box includes said personal code.

[Claim 20:] The computer readable medium of claim 18, further comprising code for receiving at least one of a document type, an author identifier, a recipient identifier and a subject description for entry within said individual timekeeper entry box.

[Claim 21:] The computer readable medium of claim 18, wherein said individual timekeeper entry box includes at least one of the following functions: pause, end, erase, minimize, maximize and favorites.

[Claim 22:] The computer readable medium of claim 18, further comprising code for storing information obtained from said individual timekeeper entry box.

[Claim 23:] The computer readable medium of claim 18, further comprising code for displaying at least one of a start time, an end time, a total time, a date, a client identifier, a personal code, a document type, an author identifier, a recipient identifier, and a subject description within said individual timekeeper entry box.

[Claim 24:] The computer readable medium of claim 18, further comprising code for displaying a running clock within said individual timekeeper entry box.

*Id.* Independent computer readable medium claim 28 pertains to tracking time on a client service-by-client service basis and claims:

A computer readable medium having computer executable software code stored thereon for an individual realtime billable timekeeper, comprising: code for detecting initiation of at least one client-service; code for generating an individual timekeeper entry box including an entry for a personal code and a second entry for a client identifier corresponding to said at least one client-service wherein said individual timekeeper entry box contemporaneously tracks time associated with said personal code and said client identifier of said client-service to track time for an individual by client on a client-service by client-service basis.

The Patent states that the descriptions "are exemplary and explanatory of the invention," and that the claimed invention is not limited to the specifications provided. Patent at 14. It describes the claimed invention as one that may be "implemented in software or hardware or both," with one embodiment involving implementation "in software as an application program tangibly embodied on a program storage device" and "uploaded to and executed by a computer device comprising any suitable architecture." *Id.* "Any computer device can be adopted for use in the invention, including, without limitation, desktop, notebook, palm pilot, handheld or like devices." *Id.* at 15. The Patent cites as part of the implementation various components of computers, including a processor, random access memory ("RAM"), read-only memory

---

*Id.* The following allegedly infringed dependent claim is a computer readable method of claim 28:

> [Claim 37:] The computer readable medium of claim 28, wherein said individual timekeeper entry box includes said personal code.

*Id.* at 19. Independent computer-readable medium claim 31 pertains to tracking time on a telephone call-by-telephone call basis and claims:

> A computer readable medium having computer executable software code stored thereon for an individual realtime billable timekeeper, comprising: code for detecting initiation of at least one telephone call; and code for generating an individual timekeeper entry box including an entry for a personal code and a second entry for a client identifier corresponding to said at least one telephone call wherein said individual timekeeper entry box contemporaneously tracks time associated with said personal code and said client identifier of said telephone call to track time for an individual by client on a telephone call by telephone call basis.

*Id.* at 18. The following allegedly infringed dependent claim is a computer readable method of claim 31:

> [Claim 40:] The computer readable medium of claim 31, wherein said timekeeper entry box includes said personal code.

*Id.* at 19.

("ROM"), clock, input/output devices such as keyboards, voice-recognition units, and telephones. *Id.*; *see id.* at 14–15. The claimed invention, according to the Patent, "interfaces with any Internet-based or LAN application program that generates a file," including Microsoft Word, Adobe Acrobat, and Internet Explorer. *Id.* at 15; *see also id.* at 15–17. And, the Patent states, the "invention can be configured to generate a billable report for an individual professional for any length of time, and can categorize and/or subcategorize the billable time entries in any suitable manner," with possible configuration "such that the report is transmitted, received and incorporated into any LAN application program that generates a file for billing purposes." *Id.* at 17.

The Patent was issued after a prior art search, which noted four prior arts of record, including ones that track time by activity and gather appointment data to create time card records. Dkt. 17-2 at 3; *see also* AC ¶¶ 13–15. Finding that "neither the prior art, the nature of the problem, nor knowledge of a person having ordinary skill in the art, provide any reasonable rationale to combine prior art teachings," the examiner allowed claims 1–40 of the Patent. Dkt. 17-2 at 3–4.

### 3. Juris Suite

RELX, through LexisNexis, manufactures, uses, offers for sale, licenses, and sells Juris Suite. AC ¶ 27. As alleged, the Juris Suite time entry screen:

> uses a computer generated timekeeper entry box to automatically track on a realtime basis one or more professional's billable time by personal code and client identifier corresponding to said employee's activities generating documents, performing services and/or participating in telephone or video conference calls on a task by task basis, including in seriatim or simultaneous multitasking for one or more clients.

*Id.* LexisNexis advertises that Juris Suite "was built in collaboration with attorneys and with one [clear] objective—to increase productivity and per-partner income," and that it "gives firm

leaders a real-time view of timekeeper productivity, client/matter status, and other financial

indicators at the click of a button." *Id.* ¶ 28; Dkt. 17-3 ("Juris Suite Overview") at 2.

The Amended Complaint cites a video that introduces users to Juris Suite's timer

functionality and includes video captures of the Juris Suite time entry screen.[3] *See* AC ¶¶ 29–33;

*see also LexisNexis Juris Suite Timers*, Business of Law (Jan. 21, 2016), available at

https://www.youtube.com/watch?v=IqsLXL88ja8 (last accessed Feb. 10, 2023) ("Juris Suite

Video"). The video starts on Juris Suite's "My Time Today" screen, under the "My

Transactions" tab. Juris Suite Video at 0:10–0:38. The "My Time Today" screen depicts three

existing entries that appear to contain information about the timekeeper, client, matter, and hours

spent on certain tasks. *See id.* The narrator opens an existing time entry, which results in a pop-

up screen with information boxes for the task's date/time, timekeeper, client, matter, task code,

activity code, hours worked, and narrative, with a check box to indicate whether the hours are

billable. *Id.* at 0:45. The pop-up screen includes a "timer display" with a "00:00:00" timer and

three clock-like buttons. *Id.*

---

[3] The original complaint links to a 2-minute, 13-second video entitled "LexisNexis Juris Suite Timers" and posted by "Business of Law." *See* Dkt. 5 ¶¶ 23–24 (citing https://youtu.be/IqsLXL88ja8). RELX's motion to dismiss links to the same video. *See* Mot. at 7 (citing https://www.youtube.com/watch?v=IqsLXL88ja8). The Amended Complaint and Realtime's opposition to the motion to dismiss, however, link to a 10-minute, 41-second video entitled "Firm Central Time & Billing Training Series—Matter Set-Up" and posted by Thomson Reuters Legal. *See* AC ¶¶ 30–33, 43 (citing https://www.youtube.com/watch?v=3cl2wT9rRic&t=59s); Opp. at 9–11 (same).

Because only the "LexisNexis Juris Suite Timers" video cited in the original complaint involves Juris Suite, and because the video captures and quotes included in the Amended Complaint can be found in only the "LexisNexis Juris Suite Timers" video, *see* AC ¶¶ 30–33, 43, the Court presumes that Realtime intended to cite the LexisNexis video and has referred only to that video in this decision.

As an illustration of Juris Suite's timekeeping function, the narrator posits a scenario in which a user has spoken with a client for a half-hour. The narrator presses one of the clock-like buttons to start the timer, notes that the timer has started running, and then clicks the button again to pause the timer. *Id.* at 00:56–1:08. After pausing the timer, the narrator clicks another clock-like button to transfer the time recorded. The narrator notes that, after pressing the button, the number in a box on the right-hand-side of the screen depicting the "Hours Worked" automatically increased by the amount of time recorded. *Id.* at 1:08–1:20. The narrator states: "You could probably see how this could be a feature that would allow you to let the system track the time that goes by as you work on each case, thereby relieving you of that responsibility and then keeping a detailed track of the time that's gone by." *Id.* at 1:20–1:36.

The narrator adds that a user "can even have another timer going." *Id.* at 1:37–1:40. As an example, the narrator posits that the user "had an interruption and a different client came in and [the user] had a call come in." *Id.* at 1:40–1:45. As to this scenario, the narrator states: "You can start a new timer and it will ask you if you would like to stop the already running timer. So the system is smart enough to know that only one timer can be running at any one time." *Id.* at 1:45–1:56. The narrator describes this feature as "very valuable" in capturing potentially unbilled time that "is slipping by." *Id.* at 1:59–2:05.

Realtime alleges that Juris Suite's time entry screen "includes all of the features of the claimed timekeeper entry box, including a personal code, client identifier and an automatic timer for tracking in realtime an employee's billable time on a task-by-task basis." AC ¶ 29. Realtime states that Juris Suite "provides realtime billable timekeeping on a task by task basis in seriatim or provides the professional with the option of stopping the running timer on one matter while [the] professional works on another matter or running timers on multiple matters

simultaneously." *Id.* ¶ 30. Realtime alleges infringement of the six independent claims and 20 dependent claims listed above. It sets out claims charts detailing the alleged infringement of independent method claim 29 and independent computer readable medium claim 31. *Id.* ¶ 31; *see also id.* ¶¶ 32–33. Realtime further alleges that RELX has had constructive knowledge of the Patent since the publication of the application August 25, 2005 and the issuance of the Patent on July 24, 2012, and actual knowledge of the Patent since Realtime filed this lawsuit on October 28, 2021. *Id.* ¶¶ 34–35.

Realtime seeks, *inter alia*, a declaratory judgment that the Patent is valid and enforceable, enhanced damages in the form of treble damages plus pre- and post-judgment interest under 35 U.S.C. § 284, and a finding that this is an exceptional case warranting the award of attorneys' fees under 35 U.S.C. § 285. *Id.* at 27–28.

### 4.    Use of Claim 29 as Representative

"Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

RELX contends that independent method claim 29, which pertains to timekeeping on a telephone call-by-telephone call basis, is representative of the asserted claims, as the dependent claims "add no meaningful limitations." Mot. at 16–17. Realtime does not appear to dispute that claim 29 is representative, *see* Reply at 6. Indeed, Realtime included in the Amended Complaint exemplary claim charts for only claim 29 and claim 31—the computer readable medium claim for timekeeping on a telephone call-by-telephone call basis. AC ¶ 31.

Accordingly, although the Court has reviewed all the independent and dependent claims at issue, the Court agrees with RELX that claim 29 may be treated as representative for purposes

of the patent validity inquiry. Independent claims 1 and 26 call for the same method as does claim 29, save with respect to timekeeping on a document-by-document basis or client service-by-client service basis, respectively. Likewise, the independent computer readable medium claims—claims 18, 28, and 31—merely provide for computer-executable software code for the methods outlined in claims 1, 26, and 29. Some dependent claims at issue, including claims 5, 6, 32, 33, and 34, entail features, such as simultaneous timekeeping and integration of information with an accounting and billing system, not explicitly mentioned in the corresponding independent claims. But, as compared to claim 29, these claims do not "differ in any manner that is material to the patent-eligibility inquiry," *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016), namely whether they are directed at patent-ineligible subject matter or disclose an inventive concept. And where "the claims are substantially similar and linked to the same law of nature, analyzing representative claims is proper." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (citation omitted).

### B.    Procedural History

On October 28, 2021, Realtime filed the Complaint. Dkts. 1, 5 (re-filed Nov. 2, 2021). On January 26, 2022, RELX waived service, making its answer due March 28, 2022. Dkt. 8. On March 28, 2022, RELX filed a motion to dismiss under Rule 12(b)(6). Dkts. 11, 12. On March 29, 2022, the Court ordered Realtime to file an amended complaint or oppose the motion to dismiss by April 18, 2022. Dkt. 14.

On April 18, 2022, Realtime filed the AC, which is operative here. On May 9, 2022, RELX moved to dismiss the AC. Mot. On May 23, 2022, the parties requested additional time to file responsive briefs, Dkt. 23, which the Court granted, Dkt. 24. On May 30, 2022, Realtime

opposed RELX's motion to dismiss. Dkt. 25 ("Opp."). On June 13, 2022, RELX filed its reply. Dkt. 26.

## II.      Applicable Legal Standards

### A.      Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

### B.      Legal Principles Governing Patent Eligibility

Under 35 U.S.C. § 101, patentable inventions include "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The Patent Act provides that all patents are "presumed valid," and "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) [is] presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a). "In light of this presumption of validity, [t]he party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence." *Quantum Stream Inc. v. Charter Commc'ns, Inc.*, 309 F. Supp. 3d 171, 181 (S.D.N.Y.) (citation omitted), *appeal dismissed*, No. 18-1769, 2018 WL 11449934 (Fed. Cir. 2018).

"Whether a claim is drawn to patent-eligible subject matter under § 101 is a threshold inquiry." *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593 (2010). It presents a "pure question of law." *Lumen View Tech. v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 204 (S.D.N.Y. 2013). The Supreme Court has "long held that [§ 101] contains an important implicit exception"—"[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012)). As the Court has memorably illustrated the point: "[A] new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter. Likewise, Einstein could not patent his celebrated law that $E=mc^2$; nor could Newton have patented the law of gravity." *Mayo*, 566 U.S. at 71 (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)). Monopolization of such "basic tools of scientific and technological work" through the grant of a patent "might tend to impede innovation more than it would tend to promote it." *Id.* (citation omitted). "[T]he concern that drives this exclusionary principle [is] one of pre-emption," as the Supreme Court has "repeatedly emphasized" that patent law should "not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted).

"The Court has recognized, however, that too broad an interpretation of this exclusionary principle could eviscerate patent law." *Mayo*, 566 U.S. at 71. "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 573 U.S. at 217. Rather, a court "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Id.* (cleaned up).

To guide the inquiry into whether a patent is drawn from patent-ineligible subject matter, the Supreme Court has established a two-step framework, sometimes referred to as the *Alice* analysis. *See id.*; *see also Mayo*, 566 U.S. 66.

First, a court must determine "whether the claims at issue are directed to one of [the] patent-ineligible concepts." *Alice*, 573 U.S. at 217. At this step, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Univ. Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021) (citation omitted). The Supreme Court has declined "to delimit the precise contours of the 'abstract ideas' category." *Alice*, 573 U.S. at 221. Instead, this category's parameters are commonly derived from a "detailed consideration of the controlling precedents," *Mayo*, 566 U.S. at 80. Abstract ideas include, *inter alia*, "fundamental economic practice[s] long prevalent in our system of commerce," such as "the concept of intermediated settlement," *Alice*, 573 U.S. at 219 (citation omitted), and methods of "organizing human activity," such as hedging to mitigate financial risk, *id.* at 220 (discussing *Bilski*).

Courts have also often found that processes that can be accomplished mentally or within the human mind draw upon abstract ideas. That is because the "application of only human intelligence to the solution of practical problems is no more than a claim to a fundamental principle." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) (alterations omitted) (quoting *Bilski*, 545 F.3d at 965); *see also, e.g.*, *Mortg. Grader*, 811 F.3d at 1324–25. In this vein, the Federal Circuit has "treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

In addition, "fundamental economic and conventional business practices are often found to be abstract ideas, even if performed on a computer." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016); *see id.* at 1339 (claims may be invalid at *Alice* step one where "general-purpose computer components are added post-hoc to a fundamental economic practice"); *see also Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020) ("[I]t is not enough, however, to merely improve a fundamental practice or abstract process by invoking a computer merely as a tool."). And "[a]utomation or digitization of a conventional method of organizing human activity . . . does not bring the claims out of the realm of abstractness." *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022). Nonetheless, the Federal Circuit has not "read *Alice* to broadly hold that all improvements in computer-related technology are inherently abstract and, therefore, must be considered at step two"; rather, "some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, such as a chip architecture, an LED display, and the like." *Enfish, LLC*, 822 F.3d at 1335. In particular, "claims purporting to improve 'the functioning of the computer itself' or 'an existing technological process' might not be directed to an abstract idea." *Weisner*, 51 F.4th at 1082 (quoting *Alice*, 573 U.S. at 225). "[P]atent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality itself." *Univ. Secure Registry*, 10 F.4th at 1346 (discussing cases involving authentication technology).

If a court determines that claims draw upon a patent-ineligible concept, the court proceeds to step two of the *Alice* analysis. At this step, the court "search[es] for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18 (citation omitted). As the Supreme Court has framed that inquiry: "[W]hat

else is there in the claims before us?" *Id.* at 217 (quoting *Mayo*, 566 U.S. at 78).  To answer that question, a court considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 78–79).  Applying this logic, for example, the Court found patent-eligible claims for a process of curing rubber that employed a "well-known" mathematical equation where the process "incorporate[d] in it a more efficient solution of the equation." *Diamond v. Diehr*, 450 U.S. 175, 187–88 (1981).

"The introduction of a computer into the claims does not alter the analysis at . . . step two," and a "computer implementation" does not, on its own, "supply the necessary inventive concept." *Alice*, 573 U.S. at 222.  As the Federal Circuit has emphasized: "A simple instruction to apply an abstract idea on a computer is not enough." *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).  And, it has held, a patent does not constitute a sufficient inventive concept by "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer." *Id.*; *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012).  An inventive concept is also unlikely to exist when the processes claimed in a patent could be accomplished, even in real time with variable inputs being affected, by "using a pencil and paper" and a "simple" device. *See Intell. Ventures*, 792 F.3d at 1368–69.

Accordingly, in *Alice*, the Court found patent-ineligible a "claimed method requir[ing] the use of a computer to create electronic records, track multiple transactions, and issue simultaneous [automated] instructions" for the purpose of intermediated settlement. *Alice*, 573 U.S. at 224.  In the Court's view, "all of these computer functions are 'well-understood, routine,

conventional activities' previously known to the industry." *Id.* at 225 (quoting *Mayo*, 566 U.S. at 73) (alteration omitted). And because "[t]he method claims d[id] not, for example, purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field," the claims "amount[ed] to 'nothing significantly more' than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer." *Id.* at 225–26 (quoting *Mayo*, 566 U.S. at 79). Likewise, the Federal Circuit has found invalid patents directed at "simply adding conventional computer components to well-known business practices." *See Enfish, LLC*, 822 F.3d at 1338 (citing cases).

### C.   Legal Principles Governing Patent Infringement

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly-construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 454 F. Supp. 3d 229, 241 (S.D.N.Y. 2020) (quoting *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999)). "To prove infringement, the patentee must show that the accused device meets each claim limitation [of the patent-in-suit], either literally or under the doctrine of equivalents." *Ottah v. Bracewell LLP*, No. 21 Civ. 455 (KPF), 2021 WL 5910065, at *6 (S.D.N.Y. Dec. 10, 2021), *appeal dismissed*, No. 22-39, 2022 WL 2619806 (2d Cir. June 6, 2022), *and aff'd*, No. 22-1876, 2022 WL 16754378 (Fed. Cir. Nov. 8, 2022).

In construing a patent's scope, "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). "However, district courts are not (and should not be) required to construe every limitation present in a

patent's asserted claims." *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 612 (S.D.N.Y. 2014) (citation omitted). "Rather, [c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims." *Id.* (citation omitted).

To determine the meaning of claims, courts look "first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Where an analysis of the intrinsic evidence fails to resolve ambiguity in a claim, the Court may turn to extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc). Subject to certain exceptions, there is a "heavy presumption" that each claim term should be construed according to its ordinary and customary meaning, as understood by a person of ordinary skill in the art in question at the time of the invention. *Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016) (citation omitted).

A plaintiff claiming patent infringement "need not prove their case at the pleading stage." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1346 (Fed. Cir. 2021). Nor is a plaintiff "required to plead infringement on an element-by-element basis." *Id.* at 1352. However, "a plaintiff cannot assert a plausible claim for infringement under the *Iqbal/Twombly* standard by reciting the claim elements and merely concluding that the accused product has those elements." *Id.* at 1353. "There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim." *Id.* "[A]llegations that are 'merely consistent with' infringement are insufficient." *Id.* at 1354 (quoting *Twombly*, 550 U.S.

at 557).  Instead, the complaint must "give rise to a reasonable inference" that a product infringes

the claims at issue, and "support[] [its] assertions with specific factual allegations."  *Id.* at 1356.

### III.    Discussion

RELX moves to dismiss the Amended Complaint on two grounds.  First, it argues that

the '810 Patent is invalid as a matter of law under 35 U.S.C. § 101 because it claims an abstract

idea, and simply "automates" the "routine business practice" of tracking time spent on billable

client-related tasks by "using a general, all-purpose computer."  Mot. at 2; *see also id.* at 16–23;

Reply at 1–5.  Second, it argues that Realtime fails to plausibly allege that Juris Suite, which

requires that the user manually activate the timekeeping function, infringes the Patent, which

claims an invention that detects the initiation of a task without user input.  Mot. at 1; *see also id.*

at 12–16.  For the following reasons, the Court finds that the Patent is directed toward patent-

ineligible matter and is invalid under § 101, and accordingly grants RELX's motion to dismiss.

### A.    Need for Claim Construction

At the threshold, Realtime argues that RELX premises its arguments on an "inappropriate

and erroneous" construction of its Patent's claims.  Opp. at 16.  It contends that RELX wrongly

depicts the Patent as limited to detection of the initiation of a billable task without user input.

*See id.* at 16–17.  In fact, Realtime states, "the [AC] alleges that the claimed invention covers

computer detection with user input."  *Id.* at 16.  Realtime argues that it would be improper to

construe the Patent otherwise on RELX's Rule 12(b)(6) motion.  *See id.* at 8.  RELX counters by

drawing upon the words of the Patent itself.  It argues that "[e]ach asserted claim expressly

requires the claimed software *itself* to be capable of 'detecting' when an end user initiates a

client-related task," and thus that the depiction of the Patent by Realtime in this litigation entails

a "wholesale rewriting of the claims."  Reply at 2–3; *see also id.* at 4–5.

22

There is much force to RELX's characterization of the Patent.  The Patent's claims do not themselves say anything about user input to initiate operation of the invention.  Measured by the claims, the role of the user under the Patent appears to be limited to initiating the underlying billable task, with the patented invention thereupon detecting that such work had commenced.  There are, however, references to the user in an embodiment described in the Patent, on the basis of which a tenable if tenuous argument conceivably could be made that, as the AC depicts the Patent, user initiation is assumed.[4]  And where a claim requires construction, the Court cannot resolve a claim construction dispute against the non-movant on a motion to dismiss without the benefit of claim construction processes.  *See, e.g.*, *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1349–50 (Fed. Cir. 2018); *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1343 n.13 (Fed. Cir. 2012) ("[C]laim construction at the pleading stage—with no claim construction processes undertaken—was inappropriate."); *see also In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment."); *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1141–42 (Fed. Cir. 2018) (court need not entertain proposed construction where claim "cannot plausibly be construed" as such).

The Court, accordingly, on RELX's motion to dismiss, will accept, *arguendo*, Realtime's construction in the AC of the Patent as encompassing user-driven detection of the initiation of a task.  On that basis, it is appropriate to resolve the motion to dismiss—and to grant it, on the ground that, as the following discussion explains, even on Realtime's construction, the claims at

---

[4] *See* Patent at 15 ("In another embodiment, a professional may be given the option of recording billable time for a particular document, service or task. . . .  A precursor request can be configured to appear[,] . . . requesting the professional whether the document, service or task should be billed."); *see also* Opp. at 14–15 (citing specifications involving user input).

issue are drawn to patent-ineligible subject matter. Claim construction "is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs.*, 687 F.3d at 1273; *see also, e.g., Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1184 (Fed. Cir. 2020); *Cleveland Clinic Found.*, 859 F.3d at 1360 (citing cases). And where the invention disclosed is invalid "under any reasonable construction," *DietGoal Innovations LLC v. Bravo Media LLC*, 33 F. Supp. 3d 271, 289–90 (S.D.N.Y. 2014), *aff'd*, 599 F. App'x 956 (Fed. Cir. Apr. 8, 2015) (per curiam), there is no need for the Court to undertake claim construction. The Court's analysis accordingly proceeds to consider the validity of the claimed invention under § 101 under each construction that has been offered: that the Patent encompasses user input to detect initiation of a task (Realtime) and that it does not (RELX). *See Guvera IP Pty. Ltd. v. Spotify, Inc.*, No. 21 Civ. 4544 (JMF), 2022 WL 4537999, at *6 (S.D.N.Y. Sept. 28, 2022) (finding no need for claim construction before ruling on eligibility where party failed to show how it would benefit from any particular construction), *reconsideration denied sub nom. Guvera IP Pty. Ltd. v. Spotify USA, Inc.*, 2022 WL 16963168 (S.D.N.Y. Nov. 16, 2022).

### B.   Validity of the Claims at Issue

RELX, making arguments under both steps of the *Alice* analysis, argues that the claims at issue are drawn to patent-ineligible subject matter. Under step one, RELX argues that the asserted claims are drawn to "keeping track of time spent on billable client-related tasks," and that this quotidian and "longstanding business practice" constitutes an abstract idea. Mot. at 17; *see id.* at 18 (citing cases); Reply at 6–7. Under step two, RELX argues that the claims at issue do not transform this abstract idea into a patent-eligible application, because the claims simply implement the idea by presupposing "some unspecified, generic computer." Mot. at 20 (quoting *Alice*, 573 U.S. at 225–26); *see id.* at 21–23.

24

Realtime counters that the AC contains sufficient allegations that the claimed invention is a "technological improvement in computer technology and capability." Opp. at 18. Thus, Realtime argues, it is patent-eligible under step one of the *Alice* analysis, and there is no need to reach step two of the analysis. *Id.* at 18–19. In support, Realtime cites language from the AC and the Patent stating that the claimed invention "employs a significant improvement to the capability of the computer system" and addresses deficiencies in prior art. *See id.* at 20–22 (quoting AC). Realtime rejects RELX's "overgeneralize[d]" characterization of the Patent as addressed to timekeeping for billable tasks. *Id.* at 22. It argues that timekeeping of tasks *in seriatim* and simultaneously, and for multiple clients, could not be performed absent the claimed invention. *Id.* at 23–24.

For the reasons that follow, the Court agrees with RELX that the claims at issue are directed toward an abstract idea and lack an inventive concept, and that the Patent is therefore invalid under § 101.

### 1.    *Alice* Step One: Whether Claims Are Directed Toward a Patent-Ineligible Concept

Under step one of the *Alice* analysis, the Court must determine "whether the claims at issue are directed to [a] . . . patent-ineligible concept[]." *Alice*, 573 U.S. at 217. The Court has carefully considered the claims of the Patent, and undertaken a "detailed consideration of the controlling precedents" most apposite to it. *Mayo*, 566 U.S. at 80. The Court finds the claims at issue to be directed to a patent-ineligible abstract idea or mental process.

The Patent claims a method for tracking and recording, in real time, the time spent by an individual on billable tasks—that is, detecting the initiation of a task, generating a timekeeper entry box containing information about the task, and contemporaneously tracking time spent via a running clock that can start, pause, and end timekeeping on tasks performed sequentially or

simultaneously. *See* Patent at 17–18. In essence, the Patent recites the abstract concept of

timekeeping for compensation. Such is a "fundamental economic practice long prevalent in our

system of commerce," *Alice*, 573 U.S. at 219 (citation omitted), to which professionals in

numerous fields in which client billing is commonly based on unit of time worked (for example,

lawyers, accountants, and architects) could attest. This concept is fairly equated to concepts that

the Supreme Court, the Federal Circuit, and lower courts have found to reflect abstract ideas that

lack protection under § 101. These include intermediated settlement, *see generally id.*; risk-

hedging, *see Bilski*, 561 U.S. at 609–11; task generation in a field entailing recurrent projects,

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1339–40 (Fed. Cir.

2013); data collection, analysis, and storage, *Rady v. Bos. Consulting Grp., LLC*, No. 20 Civ.

2285 (ALC), 2022 WL 976877, at *2–3 (S.D.N.Y. Mar. 31, 2022); and the automated process of

sending reminders to clients and receiving responses, *see WhitServe LLC v. Donuts Inc.*, 809 F.

App'x 929, 933 (Fed. Cir. 2020) (finding claimed methods to be directed to a "fundamental

economic practice involving simple information exchange" and thus drawn to abstract idea).

  To be sure, the modern professional services environment that gave rise to Realtime's

claimed invention differs in mechanics and optics from the historical settings in which humans

have recorded time for a commercial purpose. But, whether by quill or by computer, humans

have undertaken such timekeeping for client or customer benefit for centuries. In this respect,

too, the Patent claims here are problematic under § 101, as that provision has been given

meaning by the case law. *See, e.g., DietGoal Innovations LLC*, 33 F. Supp. 3d at 284 (finding

claimed invention for meal planning to be drawn to abstract idea engaged in by humans "for

millennia" (citation omitted)); *Lumen View*, 984 F. Supp. 2d at 200 (finding claimed method for

matchmaking to be mathematical manifestation of fundamental process performed "all through

human history"); *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1004–05 (Fed. Cir. 2017) (upholding claims for graphical user interface displaying information about market commodities in part because it was "not an idea that has long existed").  That the claims as drawn do not literally "preempt all" such timekeeping and purport to limit themselves to a professional services setting does "not make them any less abstract."  *OIP Techs.*, 788 F.3d at 1362–63 (citing cases); *see also buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (holding that claims "squarely about creating a contractual relationship" drew on idea of "ancient lineage," even where dependent claims "narrow[ed] to particular types of such relationships").

Realtime defends the Patent on the ground that the claimed invention is "not directed to *any* form of 'recording time'" and instead is "a specific improvement to computer systems and capabilities" that "fix[es] a specific problem in the prior art."  Opp. at 20–21.  It contends that the invention's "specific, structured front end user interface combined with a backend computer functionality" brings "a significant improvement to the capability of the computer system as a whole" and thus constitutes patentable subject matter.  *Id.* at 20 (quoting AC ¶ 12); *see also id.* at 21–24.

These locutions, by which the Patent essentially envisions in the broadest terms that a computer will take on the familiar components of human timekeeping work, do not salvage the Patent under § 101.  A review of the Patent's claims "in their entirety," *Univ. Secure Registry*, 10 F.4th at 1346 (citation omitted), makes apparent that the "focus of the claims" is not on the "specific asserted improvement in computer capabilities," *Enfish*, 822 F.3d at 1336, but rather the abstract idea of timekeeping through the use of generic computer parts.  The Patent

effectively says as much. *See, e.g.*, Patent at 14–15 (stating that invention can be implemented on "[a]ny computer device" with processor, memory, clock, input/output devices).

Even the most ostensibly novel aspects of the claimed invention—such as the invention's assumed capacity to detect the initiation, pause, or cessation of a task; its assumed capacity to record time spent on simultaneous tasks; and its assumed integration with a separate accounting or billing system—do not change this result. These generalized claims do not "recite any assertedly inventive technology for improving computers as tools"; rather, the Patent's use of broad computer terminology, while avoiding preempting the underlying concepts of starting, completing, quantifying, and memorializing timekeeping, do no more than announce that a computer will carry out those prosaic tasks. *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018). The embodiments in the Patent describe automatic participation by a computer—alongside, depending on how the Patent is read, some or no user input—in the timekeeping process. But they do not themselves represent or describe improvements in computing systems. They do not describe specific new technology or a new method that improves the computer's functionality. *Cf. Quantum Stream Inc.*, 309 F. Supp. 3d at 186. Because the Patent's claims "are recited only at the broadest, functional level, without explaining how [each function] is accomplished, let alone providing a technical means for performing that function," *Interval Licensing*, 896 F.3d at 1346, they lack "sufficient specificity to constitute an improvement to computer functionality itself," *Univ. Secure Registry*, 10 F.4th at 1346.

For these reasons, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), on which Realtime relies, does not assist its cause. There, the Federal Circuit upheld as valid a patent for "an innovative logical model for a computer database." *Enfish*, 822 F.3d at 1330. It did so on the basis that "the plain focus of the claims is on an improvement to computer

functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Id.* at 1336. In particular, the Federal Circuit reasoned, because the claims at issue were "not simply directed to *any* form of storing tabular data, but instead [we]re specifically directed to a *self-referential* table for a computer database" that "functions differently than conventional database structures," the claims were "directed to an improvement of an existing technology" through "improv[ing] the way a computer stores and retrieves data in memory." *Id.* at 1337, 1339; *see also, e.g., CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (upholding at *Alice* step one cardiac monitoring device that "achieve[d] multiple technological improvements"); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1360, 1362 (Fed. Cir. 2018) (upholding at *Alice* step one claims that "recite[d] a specific improvement over prior systems, resulting in an improved user interface for electronic devices," and included concepts such as "summary window" and "unlaunched state" that are "specific to devices like computers and cell phones"). The *Enfish* court's warning against "describing [] claims at such a high level of abstraction and untethered from the language of the claims" such that "the exceptions to § 101 swallow the rule" is well taken. 822 F.3d at 1337. But here, it is not the Court's description, but the claims within the Patent itself, that announce the Patent's high level of abstraction. By their terms, these unavoidably are focused on the "economic . . . task[] for which a computer is used in its ordinary capacity," *id.* at 1336—tracking and recording time spent on billable tasks—rather than on a "specific improvement to computer functionality," *id.* at 1338.

More apposite is *Weisner v. Google LLC*, 51 F.4th 1073 (Fed. Cir. 2022). There, the Federal Circuit found that claims for "creating a digital travel log" were directed to an abstract idea. *Weisner*, 51 F.4th at 1082. It cited with approval the district court's observation that

"[h]umans have consistently kept records of a person's location and travel in the form of travel logs, diaries, journals, and calendars." *Id.* It held that the claimed invention's ability to "automatically record[] physical interactions" and "limit[] what is recorded to only specific types of interactions" did not render the claims non-abstract. *Id.* And, the Federal Circuit held, the claims' recitation of "a number of generic elements—including a processing system, an application, and a handheld mobile communication device—d[id] not shift their focus away from the core idea of creating a digital travel log." *Id.* at 1083. Similarly here, the claims at issue are directed to the abstract idea of recording human activities. The automation of this work through generic computing device, without more, does not "shift their focus away from the core idea," *id.*, of keeping time as to billable tasks.

Also instructive is *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). There, the Federal Circuit considered a claimed method for "detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected electric power grid." *Id.* at 1351. Like the claims in the Patent here, those in *Electric Power Group* involved the use of computers to automatically detect events and generate information based on those events. Nonetheless, the Federal Circuit held that these failed at step one of the *Alice* analysis. The claims, it explained, were "clearly focused on the combination of" various "abstract-idea processes," rather than on "an improvement in computers as tools." *Id.* at 1354; *see also, e.g.*, *Intell. Ventures*, 792 F.3d at 1367–68 (finding claims for financial budgeting, even through use of Internet and telephone networks, to be directed to abstract idea). Like those in *Electric Power Group*, Realtime's claims "defin[e] a desirable . . . result," *Elec. Power Grp.*, 830 F.3d at 1351, but they lack sufficient detail as to how to conduct the claimed steps, including how to detect the initiation of a task and how to

30

integrate the information into a billing system. *See, e.g.*, *Trading Techs.*, 675 F. App'x at 1005

("[I]neligible claims generally lack steps or limitations specific to solution of a problem.");

*Guvera*, 2022 WL 4537999, at *5 (summarizing *Electric Power Group* and noting that a patent's

claim of "*results* rather than a specific method reaffirms the conclusion that it is directed to an

abstract idea").

Realtime also notes that its Patent covers the contemporaneous timekeeping of tasks

performed *in seriatim* or simultaneously, for multiple clients, and by one or more individuals.

These functions, it states, "would not be possible to achieve for one or more individuals in the

absence of the claimed invention." AC ¶ 22; *see also* Opp. at 21, 24. This argument does not

salvage the Patent, either. It is not clear why such timekeeping could not be performed by a

human being (or two) using his or her mind or basic tools such as a pen, paper, and basic timer or

clock. *Cf., e.g.*, *CyberSource Corp.*, 654 F.3d at 1371–723 *Mortg. Grader*, 811 F.3d at 1324–25

(finding invalid claimed invention for anonymous loan shopping where steps "could all be

performed by humans without a computer"). And the Patent's claimed methods for recording

the time spent on billable tasks, even applied to multiple tasks, simultaneous tasks, or tasks for

multiple clients, merely amount to a computerized means of the conventional, quotidian labor of

keeping a record of the time spent on tasks. There is nothing specialized or special about the

method described for doing so. *Contra CardioNet, LLC*, 955 F.3d at 1371 (upholding claimed

cardiac monitoring device in part because it was "difficult to fathom how doctors mentally or

manually used" logic underlying the device).

In so holding, the Court recognizes that the claimed invention—if construed, contrary to

Realtime's most recent characterization, to automatically detect the initiation and cessation of a

task rather than be triggered by human initiation—may have utility. It could reduce the time a

professional spends recording and reporting billable hours, freeing up time for other pursuits.

That, however, is not enough to satisfy § 101.  Under *Alice*, the mere"[a]utomation or

digitization of a conventional method of organizing human activity . . . does not bring the claims

out of the realm of abstractness," *Weisner*, 51 F.4th at 1083; *see also WhitServe LLC*, 809 F.

App'x at 933 (finding claims invalid at step one of *Alice* analysis, even where use of computers

enabled performance "more speedily, more efficiently, more reliably," because "focus of the

claims" was to "use computers and a familiar network as a tool to perform a fundamental

economic practice").  And "improving a user's experience while using a computer application is

not, without more, sufficient to render the claims directed to an improvement in computer

functionality." *Customedia Techs.*, 951 F.3d at 1365.  In sum, Realtime's claimed invention

certainly imagines "a new and presumably better method," *Parker v. Flook*, 437 U.S. 584, 594

(1978), for the timekeeping of billable tasks.  But because it is directed at that abstract idea, it

does not constitute the kind of "discovery" that § 101 was designed to protect, *id.* at 593.

### 2.    *Alice* Step Two: Whether Claims Contain an "Inventive Concept" Transforming the Abstract Idea into Patent-Eligible Application

The Court next considers whether the Patent's claims capture an "inventive concept"

capable of transforming the abstract idea into a patent-eligible application. *Alice*, 573 U.S. at

217 (citation omitted).  This inquiry overlaps with—and is "plainly related" to—the first step and

"look[s] more precisely at what the claim elements add." *Elec. Power Grp.*, 830 F.3d at 1353.

Realtime does not distinctly address this step of the analysis, relying instead on its contention,

which the Court has rejected, that the Patent survives step one of the *Alice* analysis.  Having

assessed the elements of the claims "both individually and as an ordered combination," *Alice*,

573 U.S. at 217 (citation omitted), the Court finds that they do not ensure that the patent amounts

to "significantly more," *id.* at 218 (citation omitted), than a patent on the abstract idea of timekeeping of billable tasks, and that the claims are thus invalid.

Although there are slight variations across the embodiments, the claims at issue, and the "Detailed Description of the Invention" section of the Patent and the flowcharts contained in figures 8 and 9, describe a computerized process in roughly six parts. The process entails (1) detecting the initiation of a task, (2) contemporaneously generating an individual timekeeper entry box that contains (either through automatic extraction or manual input) relevant information about the task, (3) tracking time spent on the task through a running clock, (4) detecting the pause, restart, and cessation of the task, (5) storing and integrating a record of the time spent on the task into an accounting and billing system, and (6) producing a daily report of the billable tasks, for tasks performed *in seriatim* and simultaneously. *See* Patent at 10–11, 14–19. As summarized, the claimed methods can be implemented on "[a]ny computer device" and "in software or hardware or both," with implementation requiring various computer components, including a processor, RAM, ROM, clock, and input/output devices. *Id.* at 14–15.

That, however, is all. Considered "individually and as an ordered combination," *Alice*, 573 U.S. at 217 (citation omitted), the claimed sequence of steps does not constitute an "inventive concept," *id.* (citation omitted). The claims describe a generic timekeeping process facility by the mere application of generic computer components. The functions to be performed are "well-understood, routine, conventional activities previously known to the industry," *id.* at 225 (citation and alteration omitted), specifically professionals who track time for their clients. These activities are: logging time spent on billable tasks, creating records of billable hours, and displaying those hours in a digestible format.

The asserted claims also neither "invoke any assertedly inventive programming," nor "require any nonconventional computer, network, or display components, or even a non-conventional and non-generic arrangement of known, conventional pieces," *Elec. Power Grp.*, 830 F.3d at 1355 (citation omitted). *See, e.g.*, *Weisner*, 51 F.4th at 1083–84 (finding specification "describ[ing] the components and features listed in the claims generically," for example, by referencing "methods such as Bluetooth" and "any other handheld electronic device," to lack inventive concept); *WhitServe LLC*, 809 F. App'x at 934 (finding claims lacked inventive concept where they "require[d] only generic components," such as a computer, database, and software "to perform their routine and conventional functions"). This case is thus well afield from those in which a patent claims "a specific improvement" to technology and "requir[es] a specific set of ordered steps that [went] beyond the abstract idea," *CosmoKey Sols. GmbH & Co. KG v. Duo Sec., Inc.*, 15 F.4th 1091, 1098–99 (Fed. Cir. 2021) (upholding "technical solution to a security problem in networks and computers" that offered "technical improvement over conventional authentication methods"). Rather, here, the claims describe the same processes a practitioner would use for timekeeping, and "simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *DietGoal Innovations*, 33 F. Supp. 3d at 287 (quoting *Alice*, 573 U.S. at 225).

In this respect, the Supreme Court's decision in *Alice* is an instructive analog. It found nonprotected claims that did "no more than require a generic computer to perform generic computer functions," such as by performing the "generic" functions of "electronic recordkeeping," "obtain[ing] data," and "issu[ing] automated instructions." *Alice*, 573 U.S. at 225. These functions are akin to those the Patent asserts here. The Federal Circuit has likewise invalidated claims that essentially substituted conventional computer components for the garden-

variety business practices of gathering, storing, and displaying information.  *See, e.g.*, *Mortg. Grader, Inc.*, 811 F.3d at 1324–25 (finding invalid claims applying "generic computer components" to perform "anonymous loan shopping," where claims did not purport to "improve the functioning of the computer, "effect an improvement in any other technology," nor "solve a problem unique to the Internet" (citations omitted)); *OIP Techs.*, 788 F.3d at 1363 (finding claims failed to transform abstract idea of offer-based price optimization to inventive concept where they "requir[ed] conventional computer activities or routine data-gathering steps"); *buySAFE, Inc.*, 765 F.3d at 1355 (similar, for contract performance).

Realtime casts the Patent differently.  The Patent, in its account, responds to the "endemic problem in all professional service related companies and businesses involving '[t]he absence of a computer system which monitors billable time for every . . . task undertaken . . . contemporaneous with the service being performed.'"  AC ¶ 16 (quoting Patent at 13).  But this gloss does not salvage the non-inventive Patent here.  "Even if the patent[] . . . envision[s] a more elegant or efficient system . . . the relevant 'precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility.'"  *Quantum Stream*, 309 F. Supp. 3d at 187 (quoting *Intell. Ventures*, 792 F.3d at 1370).  *See, e.g.*, *Intell. Ventures*, 792 F.3d at 1368 (finding claims for financial budgeting to lack inventive concept where they merely recited "generic computer elements" and budgeting calculations at issue "could still be made using a pencil and paper" (citation omitted)); *Bancorp Servs.*, 687 F.3d at 1278 (finding claims patent-ineligible, even though required calculations could be performed more efficiently via computer, where "claims do not effect a transformation").  And, as noted, a human operator could perform the claimed timekeeping using familiar implements—as humans have long done—albeit potentially at a slower pace than the

Patent envisions a computer working. *See Quantum Stream*, 309 F. Supp. 3d at 187 (claims'

disclosure of "steps that could be performed by a human operator . . . weighs against [the

plaintiff] at step two"); *cf., e.g.*, *In re Killian*, 45 F.4th 1373, 1380 (Fed. Cir. 2022) (finding

invalid claims that did "not detail how the computer should go about determining eligibility for

benefits" and instead required "same process that humans seeking to determine benefit eligibility

must follow either with or without a computer"); *WhitServe LLC*, 809 F. App'x at 933 (finding

claims lacked inventive concept where specification stated claimed steps were "oftentimes"

practiced by professionals).

The asserted claims therefore do not contain an inventive concept sufficient to

"transform" the abstract idea of timekeeping of billable tasks into "into a patent-eligible

application," *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79).

### 3.    Application to All Asserted Claims

The Court's above analysis has used claim 29 as representative and has drawn on the

Patent's language as a whole.  This analysis extends to each of the method and computer

readable medium independent claims at issue, and their dependent claims.  That is because, as

noted, independent claims 1 and 26 call for the same method as does claim 29—the distinction

being only that timekeeping is described as taking place on a document-by-document or client

service-by-client service basis, respectively.  The respective dependent claims merely add

specificity about potential attributes of the methods.  And the language of the computer readable

medium claims is functionally identical to that of the method claims.  The "only difference" is

"the form in which they were drafted," *Bancorp Servs.*, 687 F.3d at 1277.  Thus, these claims

"must be treated as equivalent for purposes of the § 101 analysis." *DietGoal Innovations*, 33 F.

Supp. 3d at 288 (citing cases); *see also Alice*, 573 U.S. at 226 (holding invalid computer system

and computer readable medium claims—which recited "purely functional and generic" hardware—for "substantially the same reasons" as for method claims).

## CONCLUSION

For the foregoing reasons, the Court finds that the claims at issue are drawn to patent-ineligible subject matter and invalid under § 101. The Court accordingly grants RELX's motion to dismiss the Amended Complaint. This ruling, by its nature, turns on an inherent deficiency in the Patent itself. It is not remediable by a differently drafted Second Amended Complaint. The Court's dismissal is therefore with prejudice.

In light of this ruling, the Court does not have occasion to resolve the parties' arguments as to whether Juris Suite infringes the Patent, if valid.[5] *See, e.g., RDPA, LLC v. Geopath, Inc.,* 543 F. Supp. 3d 4, 25 (S.D.N.Y. 2021).

---

[5] A brief comment on Realtime's infringement claims is worthwhile, insofar as it exposes a separate flaw in the AC. The Court has held the claims at issue patent-ineligible. However, in defending the Patent as viable, Realtime has depicted a particular ingredient of the invention—its ability to automatically detect the initiation of a task and extract information related to the task—as part of the Patent's innovative quality. *See* AC ¶ 12 (stating the Patent claims "back end computer processing to automatically detect, time and record billable time"); *see also id.* ¶ 16 (stating Patent addresses "endemic problem" involving absence of system to contemporaneously monitor billable time). Assuming *arguendo* that that Patent had been held viable on this basis, Realtime's AC would still fail to state a claim, because, tellingly, it has not plausibly alleged that Juris Suite can perform that function. *Cf. Bot M8 LLC,* 4 F.4th at 1354 (plaintiff's allegations "reveal[ed] an inconsistency that is fatal to its infringement case," where claims required program to be stored separate from the motherboard and plaintiff alleged that defendant's product stored program within the motherboard). For this reason, RELX asserts persuasively that the AC does not plausibly allege infringement. It notes that each of the six independent claims alleged to be infringed require detection of the initiation of a task without user input, whereas Juris Suite does not perform such detection. *See* Mot. at 12–16; *see also* Reply at 1–5.

Realtime counters that the AC's conclusory claim that Juris Suite "detects initiation of a telephone call" and includes code for doing so must be treated as true. Opp. at 9–12 (citing AC ¶ 31 and AC's claims charts). But the "mere recitation of claim elements and corresponding conclusions, without supporting factual allegations, is insufficient to satisfy the *Iqbal/Twombly* standard." *Bot M8 LLC,* 4 F.4th at 1355 (affirming that plaintiff failed to allege infringement where complaint's allegations were "conclusory, merely track[ed] the claim language, and d[id]

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 11 and 18 and close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 7, 2023
New York, New York

---

not plausibly allege" that the defendant's product had the claimed trait).  The AC's contention to this effect is, in fact, affirmatively undermined by the video cited by Realtime.  It indicates that Juris Suite requires a user command to signal the initiation of a task.  *See* Juris Suite Video at 00:56–1:08 (narrator pressing a button to start the timer for hypothetical scenario in which professional is speaking with a client); 1:45–1:56 (noting that a professional can "start a new timer" if they begin a task related to a different client).